19 449<br>28a 271

## HUGH COOPER v. THE STATE.

In a case where the evidence was direct and positive, circumstances of the character of those mentioned, (in an affidavit for continuance in a capital case,) might not be deemed relevant or material ; yet, in a case like the present, depending wholly upon circumstantial evidence, the mind seeks to explore every possible source from which any light, however feeble, may be derived ; and in such a case, it is peculiarly proper that the jury should have before them every fact and circumstance, however slight, which may aid them in coming to a satisfactory conclusion as to the guilt or innocence of the accused.

But as the Court could not know in advance, what would be the character of the evidence produced upon the trial, we do not hold that it was error, in

this case, to refuse the continuance ; yet, when the refusal of the continuance was made a ground of the motion for a new trial, and the facts were before the Court, and the character of the evidence seen, we think the materiality of the witness was so apparent that a new trial ought to have been granted.

Appeal from Navarro. Tried below before the Hon. Henry J. Jewett.

Indictment for murder of Benjamin J. Fortson. On the night of the 17th of September, 1855, the prisoner and the de-·ceased went fire-hunting from the premises of the deceased, and in the night the prisoner returned and reported that the deceased had been shot by some person unknown. The next day the prisoner was arrested, upon the charge of having committed the murder, and lay in prison until the case was called for trial on the 30th of November of the same year. The prisoner made an ineffectual application for a change of venue. He also moved for a continuance for the want of the testimony of Jefferson Nelson, who, it was stated in the affidavit, had been duly subpœnaed. The affidavit for a continuance contained the substance of the affidavit afterwards made by the prisoner, in support of the motion for a new trial, and the usual statements required in all cases on application for continuance. There was a bill of exceptions to the refusal of the continuance. There was in the transcript, a copy of an attachment issued for Nelson after the case was called for trial, and a return of not found. The evidence was entirely circumstantial. Cooper had been living with the deceased, in his employment, for twelve months ; and there was no attempt to disprove the evidence which was introduced in his behalf, showing his good character and his friendly relations with the deceased. In the circumstances given in evidence, there was an entire absence of any moral circumstances of suspicion. The conduct of the prisoner on the occasion, was such as an innocent man's would have been, unless the prisoner were supposed to be capable of acting that part. His story, which, from the evidence, appeared to have been related to several

persons, at different times, on the night and morning before his arrest, was so consistent at one time with another, that, in the statement of facts, the counsel, instead of writing out the testimony of each witness in relation thereto, referred from the subsequent witnesses—say, four or five—to the testimony of the first witness examined in relation thereto, by the State. The main, if not the only, circumstances going to prove the guilt of the prisoner, were, that he said he had cleaned out his gun before starting, and had not fired it off at all, whereas, when the gun was examined next day by Mr. Westbrooks, it was found that, although both barrels were loaded, the wad in one barrel was clean and the other smutted, as some said— a little smutted, as others said ; it was proved that a tow wad was found where the horse (both were on horseback) of deceased appeared to have made a spring when the gun was fired, and that it was similar to the wadding which was found in the prisoner's gun, and that the deceased used paper wadding ; the prisoner and deceased had killed a deer, and were on their way home, and about a mile or three quarters from the house of deceased at the time of the killing, in a road where it passed along a thicket on one side and trees on the other ; the prisoner, in his statement to the witnesses, invariably said that, at the time of the killing, he was in advance of deceased fifteen or twenty yards, that the deceased was carrying the lamp, and he (the prisoner) was carrying the deer ; that the horse of deceased, the instant the prisoner heard the report of the gun, rushed past him ; that he immediately turned, but neither heard nor saw any one retreating ; that he cut the deer loose and laid it down by the deceased, and struck a light and relighted the lamp, (which had been knocked out by the fall,) and left it burning by the side of the deceased ; the deer and lamp and deceased were found as prisoner described them ; but the witnesses considered it unusal for the one who did not carry the lamp to go before in fire-hunting. The deceased was shot with three sizes of shot, which entered his body on

the right side of his spine, (side next the thicket,) making a hole about the size of a half dollar, and taking mainly, as the witnesses thought, a horizontal direction, from which it appeared to have been argued that the person who fired the shot was on a level with the deceased, who was, as before stated, on horseback, and it was proved that the ground was level; and it was proved that the gun must have been, according to the varying estimates of the witnesses, within from two to ten feet; but the most reliable evidence was, that the distance must have been ten feet; no wadding was found in the body. It also appeared that the deceased and prisoner used shot of three sizes, and of the four shot which were extracted from the body, there were, as the witnesses testified, three sizes, and, as most of the witnesses testified, corresponding to the sizes found in prisoner's gun; but the shot which were extracted, were very much flattened, and one of the witnesses for the State, who appeared to be an intelligent physician, said that he would think it a pretty rough guess to compare them with the shot found in the prisoner's gun; this same witness stated that he knew of no rule in surgery by which to tell what course shot will take after entering the body. Another physician, a witness for the State, had testified that, from the direction taken by the shot, the person who fired the gun was on a level with the deceased. It should, perhaps, be stated that the shot, in entering the body, had broken four ribs and shattered the spinal column. No signs could be found about the thicket or on the other side of the road, of any person's having lain in wait; but the road was tracked up by ordinary travel. The place where the horse of deceased appeared to have made a spring, was identified. It was proved that it was common to use different sizes of shot; persons thinking they shot better; and a witness proved he used tow wadding made of bale-rope picked apart. The only circumstances approaching a moral nature, which could bear an unfavorable impression against the deceased were as follows: A witness

stated that, after the body had been examined, he asked the
prisoner what sort of wadding they had been using ; that the
prisoner told him he (the prisoner) was using tow and the de-
ceased was using paper ; witness then told the prisoner there
was a wad found; prisoner paused a minute and then asked
witness what kind of a wad ; witness told him a tow wad,
and when he did so, the prisoner leaned back from witness,
and drew or caught his breath in rather an unusual manner ;
he did not try to hide his face from witness ; witness suspi-
cioned the prisoner from the circumstances.   The other was
as follows :  A witness who did not think the gun could have
been more than three feet from deceased, said :   Cooper came
after me ; he told me that he was before the light when he
heard the shot.  I suspected him from that.  When we turned
the corpse face upwards I was noticing Cooper ; he seemed
disturbed ; he saw me and turned off and sat down on the
roadside ; as I thought, in agitation.

One of the witnesses had heard the deceased make the same
remark which he had made to Nelson, as to there being per-
sons in the county who would assassinate him if they could keep
it a secret.  The night was dark starlight.  It appeared from
the testimony that the little thicket was a well-known land-
mark, that it was very thick, that the body lay about ten or
fifteen steps beyond it in the direction of the home of deceased,
and that the tracks which were taken to be the tracks made
by the horse of deceased when he sprang, were about twenty
feet behind where the body lay.   The first witness examined
by the State, said he asked the prisoner where the deceased
was ; that the prisoner told him the place, by reference to a
slough in the road ; that witness remarked to prisoner and
the crowd, about there being a nice little thicket on the left of
the road to Bean's ; prisoner said he thought the gun fired on
the right of the road.   This conversation appeared to have
occurred either at the house of deceased, or as the crowd was
going from there to the place of the killing.  The thicket was

on the right of the road, as the deceased and prisoner were going. It should also be stated, that the witness who proved the tracks made by the horse in the act of springing, proved that there were only such tracks of one horse.

The Court instructed the jury at considerable length, and with great clearness; and there was no objection made to any part of the original charge, except to so much of it as gave in charge the general principles found in the books, as to the presumption arising from the failure of a prisoner to adduce evidence in explantion of circumstances which, unexplained, create presumptions of guilt. But after the jury retired they returned into Court, and enquired whether they could find the prisoner guilty of murder in the second degree ; and the Court informed them in effect, that they could do so, but not consistently with their duty as jurors, unless the proof showed some circumstance of mitigation in the commission of the offence. To this charge the prisoner's counsel excepted. The jury retired, and afterwards returned a verdict of guilty of murder in the first degree. A motion for a new trial was made, on several grounds, and overruled. One of the grounds was, that the Court erred in refusing a continuance. In support of the motion for a new trial, there was an affidavit by the prisoner, as follows :

And the said Hugh Cooper, for cause of new trial, says that, by the next Term of this Court, he expects to be able to procure the testimony of Jefferson Nelson, who resides in said State and county of Navarro, and his personal presence which the said defendant says is material; that he, the said Jefferson Nelson, may give his evidence in person; that the defendant has used every means in his power, being as he was a prisoner in close confinement, to procure the attendance of said Jefferson Nelson at this present Term, such diligence being already shown in the application for continuance, filed in this cause ; that he expects to prove by said Nelson that other persons besides the defendant knew where defendant

and Fortson, the deceased, were going hunting, on the night the said deceased was killed; that the said Nelson, on the same night, an hour or two before Fortson's death, saw a person skulking in a suspicious manner around the premises of the said Fortson, within less than a mile of where the said Fortson was killed; that there was wadding of the same kind found in the defendant's gun found lying in the yard at or near Fortson's house; that upon the said Nelson's seeing the person about the premises of Fortson aforesaid, the said Nelson immediately became suspicious that that person was intending to kill Fortson; that said Nelson had frequently heard Fortson say that there were men in the county who would kill him (Fortson) if they could conceal it. Defendant believes that said Nelson's suspicions concerning the intended death of Fortson, were raised by circumstances which defendant does not know of, but which defendant believes could be elicited from him if he were present; that defendant verily believes that the written testimony of said Nelson, as read to the jury, had no effect on the jury, or if any, not such effect as if the said Nelson had given the said evidence in person; that this defendant does not believe that he can prove the same facts by any other person, or from any other source; that said Nelson is not present, nor in the county of Navarro at this time, and this defendant has not been able to procure his affidavit to the foregoing facts.

The testimony of the said Jefferson Nelson, who was the overseer of the deceased, as it had been reduced to writing by the examining Court, had been offered in evidence by the prisoner, on the trial, and admitted notwithstanding the objections of the District Attorney; but the Court stated verbally in the hearing of the jury, that the said testimony was not deemed by the Court very material, and upon their retiring, did not allow the jury to take the said written testimony with them, to which action of the Court the prisoner excepted. Said testimony was as follows:

Mr. Cooper came home and set the gun by the side of the
house, and it was not moved until morning. I do not know
whether the load had been changed in the gun before it was
examined or not. I took the gun out of the house and gave
it to Mr Westbrooks. I looked at the gun before it was
moved ; if the gun had been fired off about the house I would
have noticed it. About half after two o'clock in the night, Mr.
Cooper came home and told Mrs. Fortson that Mr. Fortson
was shot. He came to my room and called me and I answered.
He then told me that Mr. Fortson was shot. I asked him if
he was dead ; he told me he was. I asked him where he was;
he told me in a flat between there and Mr. Beans ; he told me
he was lying a little to one side of the road in the weeds ; he
told me I had better go down there. I told him he had bet-
ter go, as he knew exactly where he was ; he said he would
go after Mr. Hogan. I told him I would go after Mr. Hogan
myself, or send, if he would go down where Mr. Fortson was.
After I saw that he would rather go after Mr. Hogan himself,
I picked up my gun and started to go where Mr. Fortson was.
As I got about opposite to the door where Mrs. Fortson was,
she called me. I went to her, and she asked me where I was
going. I told her I was going down to where Mr. Fortson
was shot. She caught me and told me that she did not want
the body touched until Mr. Hogan or some other officer would
see it. It was three quarters of an hour or an hour after it
was reported that he was killed, until Mr. Slater got there.
I had been out in the field since 12 o'clock, and did not get
in until after dark, and I did not know whether they were
going a hunting or not. I saw somebody on the premises that
night that I did not know ; he was not armed as I saw. I
went back to the house and got my gun, and went down to the
crib and I saw him again ; he was in the horse lot when I saw
him ; he went off toward the spring ; he crossed the fence
between the pasture gate and the corner of the horse lot; I
could not tell whether it was a negro or a white man ; I sup-

pose it was between 9 and 10 o'clock in the night when I saw
this man ; he went off in an opposite direction to where the
body was found ; when I first saw him he was about 150
yards from the house, going from the house; he was inside of
the turnip patch when I first saw him ; I called to the man
twice, and he did not answer ; it was about an hour after Mr.
Cooper and Mr. Fortson started hunting, when I saw that
man ; I do not know whether he had been to the house or not.
Mr. Fortson used mixed shot when he was hunting and there
was mixed shot at the house ; there was tow wadding lying
at the side of the house, some twelve or fifteen feet from the
house. I heard Mr. Fortson say that Mr. Taylor was at his
house that evening. Mr. Fortson said that Mr. Taylor told
him that he would find plenty deer down at the Killion field.
I don't think that Mr. Fortson had ever hunted in the Killion
field before. I told Mrs. Fortson that evening, that if I saw
any one about the house, and if I called them and they did
not answer, I would shoot them. She told me that she did
not want me to hurt any one, as Mr. Fortson would be respon-
sible. I believed there was some mischief going on among
the negroes, was the reason I had this conversation with Mrs.
Fortson. I intended to keep the negroes from visiting each
other as much as possible. I went back to the house after I
had seen this man, and told Mrs. Fortson that I believed there
was some trick out for Mr. Fortson. She asked me what
were my reasons for thinking so. I gave her no answer for I
saw that she was alarmed. When I told her that there was a
trick out she appeared to be agitated. She insisted upon my
reasons, but I did not give them. The man I saw excited my
suspicions. Mr. Cooper and Mr. Fortson had been fire-hunt-
ing previous to that night frequently. Mr. Fortson had told
me before, that he believed that there were people in the
county that would kill him if they could keep it concealed.
Mrs. Fortson seemed to be very much agitated when she
heard Mr. Fortson was shot. The house that Mr. Fortson

lived in was a double log house ; the passage is some 12 or 14 feet wide. Mr. Cooper was in the employ of Mr. Fort-son at that time ; he was sharpening a gin. When I went out to see about the negroes, I did not see any other negroes only what belonged there. I did not see anything ·wrong among the negroes that night.

The subpœna in the record referred to in the Opinion, was for Mrs. Fortson, the widow of the deceased ; it was issued on the first day of the trial, and executed same day, but the witness was not examined. It did not appear at whose instance the subpœna was issued.

*Hamilton, Croft,* and *Chandler & Turner,* for appellant.

*Attorney General* and *Thomas Harrison,* for appellee.

WHEELER, J. It cannot be denied that the affidavit for a continuance contains a substantial compliance with the Statute, if the testimony which it discloses was material. In a case where the evidence was direct and positive, circumstances of the character of those mentioned, might not be deemed relevant or material. Yet in a case like the present, depending wholly upon circumstantial evidence, the mind seeks to explore every possible source from which any light, however feeble, may be derived ; and in such a case, it is peculiarly proper that the jury should have before them every fact and circumstance, however slight, which may aid them in coming to a satisfactory conclusion, as to the guilt or innocence of the accused. Although what the affidavit proposed to prove by the witness, and what he stated in his examination before the magistrate, may not seem to be very material, and though it were all he knew that was material, the prisoner was entitled to have the benefit of it from the witness himself before the jury. But it is difficult to resist the conviction that the witness knew more, and that an examination might have elicited facts having a material bearing upon the case.

The Court could not know in advance, what would be the character of the evidence produced upon the trial. It might be such as to demonstrate the guilt or innocence of the accused, and the immateriality of the witness's testimony; and we do not hold therefore, that it was error to refuse the continuance. But when this was made a ground of the motion for a new trial, and the facts were before the Court and the character of the evidence seen, we think the materiality of the witness was so apparent that a new trial ought to have been granted. It is impossible to read the evidence, as embodied in the record, without feeling a strong desire to know what this witness would testify. The jury must have felt that desire; and, if practicable, the prisoner ought to have the benefit of gratifying it, if indeed it should prove a benefit; and of that it was his province to judge.

It has been intimated that the prisoner may not have used due diligence to obtain the attendance of the witness; for that, although he states that he has had the witness duly subpœnaed, yet there is no subpœna in the record. There is an agreement of counsel, that the subpœnas shall be copied. The statement of facts however does not purport to contain them; and although a great number of witnesses testified, but one subpœna is contained in the transcript, and that is for a witness who does not appear to have b een called to testify. Some, if not all of the witnesses, were doubtless subpœnaed, and the Clerk has omitted to copy the subpœnaes. Besides there is an attachment for this witness in the record, which would not have issued if there had not been evidence before the Court that he had been duly subpœnaed. There can be no other inference drawn from the record, than that the witness had been subpœnaed. In view of the case as presented upon the application for a new trial, we think it ought to have been granted.

In disposing of the case upon this ground, we have thought it proper to abstain from any comment upon the evidence. The further proceedings in the cause will be conducted in ref-

erence to the new Code of Criminal Procedure; it is not probable that the portion of the charge of the Court, to which exception was taken will be, as we think it better it should not be, repeated in terms; and as there is no probability that any of the other questions of law, on which the reversal was sought, will again arise for decision, their discussion would be useless and unprofitable.

The judgment is reversed and the cause remanded for a new trial.

Reversed and remanded.