## W. A. POGUE *v.* THE STATE.

1. CIRCUMSTANTIAL EVIDENCE.— When circumstantial evidence only'is relied upon to convict, it must be such as to exclude, to a moral certainty, every hypothesis but that of the defendant's guilt of the offense imputed to him. See the opinion *in extenso*, for the rule discussed, and for evidence held insufficient to sustain a conviction for manslaughter.

2. EVIDENCE — CHARGE OF THE COURT.— See the opinion for evidence which demanded of the court a charge upon the law of self-defense.

APPEAL from the District Court of Franklin. Tried below before the Hon. B. T. ESTES.

The indictment charged the appellant with the murder of Louis Harbowe. His trial resulted in a conviction for manslaughter, and he was awarded two years in the penitentiary. The opinion states the evidence in its entirety.

*S. O. Moodie*, for the appellant. We submit first, that if defendant was entitled to a charge on manslaughter, the court should also have given the jury the right to determine whether or not there was evidence of justification, and have charged them as to what would justify a homicide. *Richardson* v. *State*, 7 Texas Ct. App. 443; *Reynolds* v. *State*, 8 Texas Ct. App. 414; *Robles* v. *State*, 5 Texas Ct. App. 352; *Reed* v. *State*, 9 Texas Ct. App. 320.

Apparent danger of defendant's suffering death or serious injury at the hands of Harbowe would justify, and would require a charge on self-defense. Art. 574, Penal Code; *Cheek* v. *State*, 4 Texas Ct. App. 444; *Horbach* v. *State*, 43 Texas, 242.

Though the jury may have believed defendant to have been in apparent danger of suffering serious injury at the hands of Harbowe, or that defendant so believed, the court, in failing to instruct the jury what would justify, may have felt bound to convict under the charge. *Thomas* v. *State*, 40 Texas. 36.

The fact that the proof showed no weapons on Harbowe when found would not relieve the court from giving defendant the benefit of a charge on apparent danger, if defendant had a short time previously seen Harbowe with an instrument capable of inflicting serious bodily injury, unless the evidence further showed that defendant knew he then had no such instrument. *Thomas* v. *State,* 40 Texas, 36.

The fourth assignment goes to the sufficiency of the evidence to sustain the verdict, and the action of the court in overruling defendant's motion for new trial. We submit that under the facts proven nothing more than a strong suspicion or probability of defendant's having killed Harbowe has been shown, and that is not enough. *Rodriguez* v. *State,* 5 Texas Ct. App. 256; *Barnell* v. *State,* 5 Texas Ct. App. 113.

Any number of independent facts not pertinently connecting defendant with the main act charged will not warrant a conviction. *Roseborough* v. *State,* 43 Texas, 570; *Jones* v. *State,* 7 Texas Ct. App. 457; *Lilley* v. *State,* 41 Texas, 443.

*J. H. McLeary,* Attorney General, and *H. M. Holmes,* for the State.

WILLSON, J.   The defendant was charged with the murder of one Louis Harbowe, and upon trial was convicted of manslaughter, and his punishment assessed at two years' confinement in the penitentiary.

This case is one of circumstantial evidence alone. There was no eye-witness to the death of the deceased. The deceased came to his death on the evening of the last day of April, 1881, on the prairie, some sixty yards from the residence of Mrs. Katie Pogue in Franklin county. His death was not known until the next morning, at about 8 o'clock, when his dead body was found by John

Ahern. Ahern testified that the body, when he found it, was on its side, with the hands together and the knees together, and the head on the ground. He saw blood all around where the body was, with an occasional pool of blood. The blood was dry, and looked as if it had been shed there in the night. He saw no wounds on the body; did not touch the body and saw no weapons about there. The body was thirty or forty yards from any road. A physician who examined the dead body testified that he found an incised wound under the left ear, which had been inflicted with some sharp instrument, and which had severed the carotid artery. One or two fingers on the right hand were slightly wounded, and there were also one or two slight wounds on the arm and point of the shoulder. The character and appearance of these last mentioned wounds were not described. The physician stated that deceased died from hemorrhage. He gave it as his opinion that the wounds could have been self-inflicted, but that in his opinion they were inflicted by some one else; but he does not state upon what facts or reasons he bases this opinion. He also said that he thought the wound on the neck was made by a cut from the front, backward. The foregoing embraces all the material evidence as to the *corpus delicti*. The evidence relied upon to connect the defendant with the tragedy, and to prove him to be the perpetrator thereof, is, in substance, as follows:

Hugh Watson, a witness for the State, testified that he lived two and a half or three miles east from Mt. Vernon; that defendant lived about five miles east, and that deceased lived one and a half miles from witness. That on the evening of Harbowe's death, the said Harbowe, the defendant and witness were all at Mt. Vernon. Witness went to Mt. Vernon and there met deceased, who asked him when he was going home, and where the defendant was, saying we would all go home together. Harbowe

asked defendant when he was going home. Defendant then spoke of getting some rope, and Harbowe said that reminded him he also must get some rope for Mrs. Pogue. The deceased, defendant and witness went together to witness's house. Deceased and defendant were both drinking heavily. While near witness's house, deceased told defendant that the iron rod which he, defendant, had, belonged to him, deceased. The defendant then gave deceased the rod. It is about two miles from witness's house to Mrs. Katie Pogue's, and about the same distance to Harbowe's. The dead body was not found on the road leading from witness's house to defendant's, nor. on the road leading from witness's house to Harbowe's, but out of the way leading to either of these places. The witness stated that if Harbowe had been going to Mrs. Pogue's he would have gone by the place where his dead body was found. Harbowe was riding a sorrel mare belonging to Mrs. Pogue.

This witness stated on cross-examination that defendant and deceased were both drinking and had whiskey with them. They were friendly towards each other, and had always been friendly with each other, so far as he knew. Defendant and deceased spoke of killing hogs for Mrs. Pogue the next day. Harbowe wanted defendant to go with him to kill hogs, and defendant agreed to go, if witness would go, and witness agreed to go with them next day, and promised to meet them next morning. Witness went to Harbowe's house next morning to go with him and defendant to kill hogs, but found no person at Harbowe's house. He then saw Ahern on the prairie and went to where he was. About 9 o'clock that morning, after witness had learned of the death of Harbowe, he, witness, went to defendant's house, and told defendant that Harbowe was dead. Defendant seemed to be surprised, and said, "some of us must go up there." This witness also stated that before he went to defendant's

house on that morning he had ridden up to the dead body, and that while he was there another person had also ridden up to near the body. Witness rode direct from the dead body to defendant's house.

J. L. Ferguson, a witness for the State, testified that, when he saw the dead body, there were three men and some ladies already there. He examined some horse tracks,— went about sixty or seventy yards from where the body lay, and found the tracks to within ten steps of the body, where they seemed to stop. About twenty steps from the body the tracks indicated that the riders were struggling; the smaller track seemed to jump, and the larger track went around to the west and then turned east. Witness said he knew defendant's horse, and also Mrs. Pogue's mare that deceased was riding the night he came to his death, and that he supposed the horse would make the larger track.

Mrs. Katie Pogue, witness for the State, testified that, on the day of Harbowe's death he started to Mt. Vernon riding a sorrel pony belonging to her son. She asked him to bring her a rope from Mt. Vernon, which she had bought and left there. On the next morning she found the rope on the horn of the saddle. The saddle was on the yard fence, but she did not know who placed it there. Witness was at home on the night of Harbowe's death. The dead body, she says, was found about 100 yards from her house. A while after dusk, witness states, she heard some one coming from the south toward her house. She could hear but one voice talking loud. She recognized it as the voice of Louis Harbowe, but did not recognize any other voice. She heard Harbowe say: "Bill Stephens is a d—d hog-thief; you know that, Gus Pogue." She heard no reply to this. She also heard Harbowe say, "I'll kick you," but did not know to whom he directed this remark, or whether it was before or after the remark about Bill Stephens. She saw an animal

which she took to be her pony, without a rider, trot off towards the lot gate. Her pony was up next morning. She saw no one ride off, but she heard some one riding away, apparently going east. It was a dark, starlight night. She could not tell how many persons rode off; knew defendant's voice; had known it a long time; thinks she would have recognized his voice if it had been him that was talking to Harbowe, but she did not recognize the voice that responded to Harbowe that night. She could not say that it was or was not defendant's. This witness was the sister-in-law of defendant.

Cora Harbowe, a witness for the State, and daughter of deceased, testified that she was at Mr. Prather's on the night of her father's death. Prather's is about one quarter of a mile from where the dead body was found. Defendant on that night rode up to Prather's and hallooed, and asked where Prather was. He said he had got lost over there. He then rode off and in fifteen or twenty minutes came back. Mr. Ahern took a lamp out, and defendant would not let Ahern see him; he kept turning his horse around. He said he was going to Louis Harbowe's or Hugh Watson's and stay all night. He asked Ahern to do some ditching for him, and in fifteen or twenty minutes he came back again, and told Ahern to tell Louis Harbowe to come down next morning and help kill the hogs for Mrs. Pogue. Witness had a knife which was taken from deceased's pocket.

Mrs. Stephens, witness for the State, testified that she lived one mile from Prather's. On the night of Harbowe's death, about 8 o'clock, defendant went to her house. When she first heard him he was whistling. He hallooed at her gate, and asked the way to Mr. Handley's. She asked him what was the matter that he did not know the way home. He said Harbowe had tied a hog to his horse's tail and got him to pitching and he had been at it ever since. He seemed lost and seemed to be

drunk. He told witness who he was, and talked like he was in whiskey. Witness's son went out and talked to him.

Wm. Stephens, witness for the State, testified that he talked with defendant on the occasion referred to by the last named witness. He said he had been lost,—that his horse had been cutting up,—that Louis Harbowe had pulled a hog across the creek and through the cane, tied to his horse's tail a day or two before that, and his horse became frightened at the hog and had been cutting up ever since. Witness took defendant to be drinking, and thinks this was one hour and a half in the night. Defendant offered witness whiskey, and asked witness to go home with him and show him the way.

John Handley, a witness for the State, testified that, on the Saturday before the death of Harbowe on the following Monday, he loaned defendant a knife to cut a corn off his toe. Defendant let witness have his, defendant's, knife. Defendant's knife was a barlow, and was longer than witness's knife, single-bladed and sharp-pointed and dull. Witness's knife was a small iron-handled two-bladed knife, blade about two inches long. Defendant sharpened this knife in presence of witness. Defendant then went off hog-hunting.

M. T. Hamilton, witness for the State, testified that he knew defendant and knew his yellow horse, which defendant was riding on the night of Harbowe's death. Heard defendant say he would not take $1,000 for his horse, and would not have him to talk for $1,000. He was drinking and running on in a joke when he made these remarks. Witness did not state the time when these remarks were made, whether before or after Harbowe's death.

Henry Hamilton, a witness for the State, testified that he was a member of the jury of inquest, and examined the dead body,—found four wounds on it. The left hand

was cut, there was a scratch on the shoulder, one on the neck, and a wound under the ear.   A knife and toothpick were found in the pockets of deceased; the knife was closed up when found.   Saw blood on the ground; saw no blood on the defendant.

Dock Graham, a witness for the State, testified that he was a member of the jury of inquest.   The defendant was examined before the jury as a witness.   In answer to a question as to where he had left deceased, he answered, "I thought I left him over yonder.   I might have left him along here.   I was pretty drunk."   Witness heard a conversation between defendant and John Pike, in which defendant said, "Money is the end of the law, and I've got it."   Did not know what they were talking about.   Witness did not state when or where this conversation occurred.

Here the State closed her testimony, and the defendant introduced Jas. R. Turner, who testified that he had seen defendant on the day before the inquest, that being the day of Harbowe's death, and had also seen him on the day of the inquest, and that the defendant had on the same clothing both days, and witness saw no blood on him.   Hugh Watson, State's witness, recalled by defendant, testified the same as the witness Jas. R. Turner. Mrs. Pogue, defendant's wife, testified that defendant got home on the night of Harbowe's death about 8 o'clock or a little after.   He was drinking a great deal; had no blood on him; wore the same clothing the next day that he had worn the day before.

Upon the foregoing facts, the court instructed the jury elaborately, clearly and correctly upon the law of murder and manslaughter, and upon circumstantial evidence, and, as far as the charge extends, we see no objection to it.   The court, however, presented no instructoins to the jury upon the law of self-defense, and it is strongly contended by counsel for the defendant that this should have

been done, and that in failing to do it the court failed to give the jury the whole law of the case.

The two questions which we are called upon to determine in this case, are 1, Is the evidence sufficient to sustain the conviction; and 2, Did the facts of the case demand of the court a charge upon the law of self-defense ?

The evidence, as presented by the statement of facts, is in some important respects meager and indefinite, and in considering it the conclusion forces itself upon our minds that the facts of the case could have been made to appear in a much clearer and more satisfactory manner than they are presented in the record. Thus, it is not shown when and where the pony which deceased was riding was found — who found it — who took the saddle off it — whether or not there were any blood stains on the saddle or the pony. It was shown that the deceased on the night of his death had an iron rod;— the size and character of this rod is not shown, or what became of it. It was proved that there were four wounds on the dead body, but the evidence is very unsatisfactory as to the nature and character of those wounds. It was proved that defendant had a conversation with one Pike in which he said "money is the end of the law, and I have the money;" but it is not shown when or where this occurred, nor is Pike called upon to testify in regard to this conversation, nor is his absence from the witness-stand accounted for. It was proved that defendant made certain remarks about his horse, and yet the time and place when and where these remarks were made are not shown. It was proved that defendant was present at the inquest and testified as a witness, but it does not appear whether he was there voluntarily, or whether he was there in obedience to legal process. There are other instances in the evidence, wherein the facts are but dimly and vaguely developed, but the instances we have noticed will suffice to demon-

strate the very indefinite, incomplete and unsatisfactory character of the evidence as set forth in the statement of facts. The evidence upon the trial may have been fuller and more satisfactory than we find it in the record, but we must determine the case from the record, and ascertain from that alone whether or not the conviction is supported by the facts therein shown to be established.

In cases of circumstantial evidence, the mind seeks to explore every possible source from which any light, however feeble, may be derived, and it is peculiarly proper that the jury should have before them every fact and circumstance, however slight, which may aid them in reaching a satisfactory conclusion. (*Cooper* v. *State*, 19 Texas, 449; *Landers* v. *State*, 35 Texas, 359.) Looking to the evidence before us, we must say that there are sources from which more light might be obtained in this case, that appear to be left unexplored, and that there are facts and circumstances, though they may be slight, which could be developed, which would no doubt greatly aid in arriving at the truth of the issue involved. But, without dwelling upon this feature of the case, we will now consider the sufficiency of the evidence before us to support the verdict.

In cases depending upon this character of evidence, in determining whether or not it is sufficient to support a verdict of guilty, we are to be guided by certain well-established rules or tests, which the wisdom and experience of centuries have adopted and recognized as correct and safe, and from which it is never prudent to depart. Mr. Burrell, in his admirable work on circumstantial evidence, states the great test-rule in relation to this character of evidence in the following language: "The evidence against the accused must be such as to exclude, to a moral certainty, every hypothesis but that of his guilt of the offense imputed to him." The author then gives the rule as stated by Mr. Best and Mr. Starkie, in the following

language: "In order to justify the inference of legal guilt from circumstantial evidence, the existence of the inculpatory facts must be absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of his guilt." (Burrill on Cir. Ev. 737.) The Supreme Court of this State, and this court also, have repeatedly had occasion to discuss this subject. In the case of *Henderson* v. *State,* 14 Texas, 503, the Supreme Court cite with approval the rule as stated in the celebrated case of the *Commonwealth* v. *Webster,* as follows: "In order to warrant a conviction of a crime, on circumstantial evidence, each fact necessary to the conclusion sought to be established must be proved by competent evidence, beyond a reasonable doubt; all the facts (that is, the facts necessary to the conclusion) must be consistent with each other, and with the main fact sought to be proved; and the circumstances, taken together, must be of a conclusive nature, leading on the whole to a satisfactory conclusion, and producing in effect a reasonable and moral certainty that the accused and no other person committed the offense charged." The same rule has been cited and approved by this court in several cases. *(Hampton* v. *State,* 1 Texas Ct. App. 652; *Rodriguez* v. *State,* 5 Texas Ct. App. 256; *Barr* v. *State,* 10 Texas Ct. App. 507.) In *Hunt* v. *State,* 7 Texas Ct. App. 212, this court said: "It is no new principle in the law of this State that, to justify a conviction upon circumstantial evidence alone, the facts relied on must be absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of guilt." In *Barr* v. *State, supra,* the judgment of conviction was reversed by this court because the charge of the trial court failed to instruct the jury that the facts proved, from which the defendant's guilt is to be inferred, must not only be consistent with his guilt, but they must also

be incapable of any other conclusion than the single one of his guilt." (See also *Barnes* v. *State*, 41 Texas, 342; *Bonats* v. *State*, 29 Texas, 183; *Elizabeth* v. *State*, 27 Texas, 329; *Harrison* v. *State*, 6 Texas Ct. App. 42; *Rodriguez* v. *State*, 5 Texas Ct. App. 256; *Black* v. *State*, 1 Texas Ct. App. 368.)

Mr. Burrill, in commenting on the rule or test which we have quoted, says: " It is known from experience that the facts of cases are sometimes capable of explanation upon *more than one* hypothesis; or, in other words, that there is more than one hypothesis which will reasonably account for their existence. The great object of the rule is to ascertain whether such a state of things exists in the case under investigation, and to guard against its possible consequences; and it does this by fixing the grade of the belief or persuasion which is to be the immediate basis of the verdict, and requiring that it shall possess the quality of *moral certainty.* ' Now, as long as there is a single other hypothesis besides that which the mind, in the first instance, inclines to adopt, which will account for the facts proved, and therefore *may be true* as well as the first one, it is obvious that this moral certainty, which is in its nature *exclusive*, cannot exist. Under this rule, therefore, other hypotheses besides that which coincides with the *factum probandum* (that is, other hypotheses proceeding upon the general idea of the innocence of the accused) must be sought for, and individually compared with all the facts proved, and rejected or excluded as incompatible with them, before the hypothesis of guilt is to be adopted, and the *factum probandum* held as conclusively proved." (Burrill Cir. Ev. 738.)

In other words, applying the rule to the case before us, if the inculpatory facts and circumstances are capable of two or more explanations, one of which is consistent with the innocence of the accused, and the other consistent only with his guilt, then the evidence does not fill

the test of *moral certainty,* and is insufficient to support the conviction. Of course it is not every hypothesis of innocence that will be sufficient to exclude the one of guilt. It must be reasonable, and not inconsistent with the facts in evidence, or it will be excluded from consideration. If it accounts for the facts with equal reason with the one of guilt, it must prevail, and the accused must be acquitted. If it account for the facts so far as to render the defendant's innocence probable, against only a greater probability of his guilt, it must still prevail over the hypothesis of guilt; for mere probability will not constitute a sufficient basis of conviction. (Burrill Cir. Ev. 183–189.)

Now, in the case before us we have the hypothesis of the defendant's guilt, supported by the following circumstances only:  1. The defendant was the last person seen with deceased on the night of the tragedy.  2. Deceased was heard to address a remark to defendant on that night at or near the place where the dead body of deceased was found on the next morning.  3. Defendant was seen alone that night, after the time when it is supposed deceased was killed, and appeared to be lost and drunk.  4. The dead body of deceased was found next morning, with wounds upon it, and one mortal wound which had the appearance of having been inflicted with some sharp instrument.  5. The dead body was found near where deceased and defendant were last known to be together.  6. The tracks of two horses were discovered next morning near the dead body, and the appearance was that the riders of the horses had been engaged in a struggle.  7. The defendant, when asked where he had left deceased, said " I thought I left him over yonder, I might have left him along here; I was pretty drunk."  8. His remark about money being the end of the law; and 9. His remarks about his horse.

On the other hand we have the counter-hypothesis of

the defendant's innocence supported by the following circumstances:   1. Defendant and deceased were friends, and defendant had no motive to kill deceased.   2. Defendant was drunk, and this might account for his otherwise singular conduct, and for his want of knowledge as to where he had left deceased.   3. Deceased might have killed himself.   4. Some other person may have come up with deceased and killed him, after defendant had left him, as it was testified by Mrs. Pogue that she heard a voice talking with deceased at or about the place he was killed, and did not think it was defendant's voice.   5. If defendant did kill him, he might have been acting in self-defense, as deceased was armed with an iron rod, and there were evidences on the ground of a struggle, and he was heard talking in a loud tone of voice at that place. 6. Defendant had no blood stains on his clothes.   7. Defendant did not attempt to flee the country, but attended the inquest on the next day.   8. When he was informed of Harbowe's death he appeared surprised.

Now, is the hypothesis of defendant's innocence unreasonable, improbable and inconsistent with the facts in evidence? If it is, then it must be excluded, and the hypothesis of guilt allowed to prevail.   But if it is not, then the evidence of guilt does not fill the measure of the law, and the conviction cannot stand. In our opinion, taking all the testimony together, and applying to it the tests provided for this character of evidence, it does not come up to the standard of *moral certainty*, and does not exclude every other reasonable hypothesis save the one of defendant's guilt.  We think the hypothesis of defendant's innocence is consistent with every fact in the case, and is reasonable, and supported by testimony equally as satisfactory as that of his guilt.

We think furthermore that the facts in evidence demanded a charge on the law of self-defense.   The evidence showed that deceased had an iron rod, and that

there were evidences on the ground of a struggle, and deceased was heard to say, "I'll kick you." It might have been the case that deceased made a violent and dangerous attack upon defendant with the iron rod, and that defendant to protect himself from this assault cut and killed deceased. It is just as reasonable to suppose such a state of case from the evidence as to suppose that state of case which would constitute manslaughter. It was a matter for the jury alone to determine, and we think the defendant was entitled to have the issue, and the law applicable to it, submitted to the jury. (*Wasson* v. *State*, 3 Texas Ct. App. 474; *Lister* v. *State*, Id. 17.)

Because we are of the opinion that the evidence is insufficient to support the conviction, and because we think the court erred in not instructing the jury upon the law of self-defense, and because we believe, further, that the facts of this case have been imperfectly developed, and that upon another trial more light may be thrown upon the tragedy, the judgment is reversed and the cause remanded.

*Reversed and remanded.*