The State v. Leabo.

THE STATE V. LEABO, *Appellant.*

1. **Practice:** EVIDENCE: MURDER.   On the trial of a husband for the murder of his wife, where the state introduces evidence consisting exclusively of the conduct and expressions of the wife to show that the relations between them were unpleasant, and to show motive for the crime, to meet it, letters of the wife to an intimate friend, written five, four, and three months before her death, in which she expresses an affectionate regard for her husband, are admissible, and their exclusion is erroneous.

2. ———: INSTRUCTION.   An instruction, that if defendant killed deceased by "choking and strangling" her, and by "suffocating and drowning her in the well" he is guilty, is not contradictory.

*Appeal from Butler Circuit Court.* — HON. JAS. B. GANTT, Judge.

REVERSED.

*Holcomb & Silvers* for appellant.

(1)   The court erred in permitting the witness, T. J. Wilson, to testify: "I had been called to Mr. Leabo's the Sunday previous.   I heard that he was having trouble with his wife.   Defendant wanted to know if he could get rid of his wife and keep the baby."   Part of it was heresay and clearly incompetent, and the error was not cured by withdrawing it after it had once poisoned the minds of the jury.   *State v. Daubert,* 42 Mo. 246; *State v. Hopper,* 71 Mo. 425.   It was error to permit non-expert witnesses to testify that "the marks on the neck looked like finger prints."   Such witnesses should only state facts.   *Sparr v. Wellman,* 11 Mo. 231; *Wagner v. Jacoby,* 26 Mo. 530.   Testimony of the results of the second *post mortem* examination should not have been admitted as it was *ex parte.*   Whar. Cr. Ev. (8 Ed.), §§ 421, 422; 2 Whar. and S. Med. Juris., part 2, § 1246; Rogers' Expert Testimony, p. 20, § 14.   It was error to allow the

expert witnesses to testify that in their opinion a human hand produced the wound on the neck. The jury were as capable of coming to a correct conclusion when in possession of the facts as the witnesses. *Swan v. O'Fallon*, 7 Mo. 231; *Newmark, etc., v. Liverpool, etc., Ins. Co.*, 30 Mo. 160; *Gavisk v. Pacific R. R. Co.*, 49 Mo. 274; *Eyerman v. Sheehan*, 52 Mo. 221; *Dillard v. State*, 58 Miss. 368; *Cook v. State*, 24 N. J. 843; *Milwaukee R. R. Co. v. Kellogg*, 94 U. S. 469; *Kennedy v. People*, 39 N. Y. 245; *Western Ins. Co. v. Lobin*, 32 O. 77. (2) The deposition of the witness, Ella Finley, and the letters of deceased, written to this witness, should have been submitted to the jury. Wharton on Crim. Ev. (8 Ed.) §§ 21, 23, 24, 25, 26, 27; 15 Law Journal, 237. (3) Instruction numbered one for the state is erroneous and inconsistent. It contains two inconsistent propositions upon which the jury are left to rest their verdict. *Young v. Redenbaugh*, 67 Mo. 574; *Wood v. Steamboat Fleetwood*, 19 Mo. 529; *Belt v. Good*, 31 Mo. 128; *Clark v. Kitchen*, 52 Mo. 316; *Mosier v. Kitchell*, 87 Ill. 19. (4) The verdict is contrary to the evidence. The state did not make out its case and the judgment should be reversed. *Pitts v. State*, 43 Miss. 472; *Whitsett v. Ransom*, 79 Mo. 258; *State v. Packwood*, 26 Mo. 340; *State v. Mansfield*, 41 Mo. 470; *State v. Daubert*, 42 Mo. 242; *State v. Marshall*, 47 Mo. 378; *State v. Burgdorf*, 53 Mo. 65; *Moor v. Hutchison*, 69 Mo. 429; 57 Wis. 472.

*D. H. McIntyre*, Attorney General, for the state.

(1) It has been held that *post mortem* examinations are admissible without the attendance of the defendant or his counsel. *State v. Bowman*, 80 N. C. 432; Whar. on Crim. Ev. (8 Ed.) § 421. (2) The experts who conducted the *post mortem* examination had made special examination and were entitled to give their opinions. (3) The deposition of Ella Finley, with letters annexed, was irrelevant and incompetent. (4) The instructions were concise and clearly presented the law of the case to

the jury and were unobjectionable, and the verdict was fully supported by the evidence. This court will not reverse a judgment because against the weight of the evidence, unless there is such a failure of evidence as to show that the jury acted from prejudice or partiality. *State v. Cook*, 58 Mo. 546; *State v. Warner*, 74 Mo. 83.

HENRY, C. J.—The defendant was indicted at the June term, 1884, of the Bates circuit court, charged with the murder of his wife on the 19th of December, 1883. The trial occurred at the same term and he was found guilty as charged and has appealed to this court. Without detailing the evidence it is sufficient to say that although exclusively of a circumstantial nature, it is sufficient to sustain the verdict of the jury, and the only questions, therefore, which we shall consider relate to an instruction given for the state and the exclusion of evidence offered by defendant.

There was evidence tending to prove that the relations between defendant and his wife were not as pleasant as should exist between husband and wife. This consisted exclusively of her expressions and conduct, while on the contrary several witnesses testified that, as neighbors, they had visited his house frequently and intimately, and that he was uniformly kind and affectionate in his deportment toward her. If there was a particle of evidence, except that found in the conduct and expressions of the deceased, tending to prove that defendant was ever unkind to her, it has escaped my attention, if preserved in the bill of exceptions. The state introduced as a witness T. J. Wilson, a near neighbor of the accused, who testified that on the 19th day of December, 1883, he saw deceased coming through a field carrying her babe, toward his house, and when she saw him she sat down in the grass. He went to her and she said she wanted to go to her brother's, who resided about two miles distant. They then went to the house of witness and that afternoon the defendant came for her. He asked her how

she came there, and repeated the question several times before she answered, but finally she said: "You know why I came here, and I want to go to my brother's." Leabo then took witness out for a private conversation, and asked what he had better do with his wife, saying: "Something will have to be done." Witness advised him to send her brother word about it.

They returned to the house where defendant put its wraps upon the babe and said to his wife: "Come, Luella, let us go home—these people don't want to be bothered with you." She then gathered her wraps and said she would go to her brother. Witness told her it was too late and the weather too bad, and she could stay at his house until morning, when he would go, or send for her brother. She said: "The neighbors had promised to take her and did not do it, and I do not want to get them into trouble, as John (the defendant), had said he would shoot the man that interfered." Witness told her that he and John were good friends and there would be no trouble between them. She replied that if she could depend upon him that she would go back with John and stay one more night with the baby. They then went home. Several witnesses testified to circumstances tending strongly to prove that Mrs. Leabo was periodically slightly deranged before and after her marriage, and when so affected expressed herself as weary of life. On one occasion after her marriage she stealthily left her husband's home and went to her father's house. For what reason is not disclosed, and that her husband went and brought her back to her home. There was no evidence, except her declaration, to show that Leabo had ever made a threat against any one who should interfere between them.

The defendant offered, but the court excluded, the deposition of Ella Finley, who was an intimate friend of the deceased, both before and after marriage, and between whom there had been an epistolary correspondence. Three letters of Mrs. Leabo to the deponent were attached to

the deposition, dated respectively August 5, 1883, September 1, 1883, and September 21, 1883. In that of August 5, she wrote: "Oh! Ella, we have built us such a nice, little cosy house, and it is so snug and cosy—in fact we are so happy, our sweet little Perry and only him and me to be here." In the letter of September 1, she wrote: "I have the kindest husband in the world," and in that of September 21, she said: "Oh! Ella, pray for me, for I am tired in every way. I have a man who is worth his weight in gold. I hope you will give up single blessedness and join the benedicts, if you get such a man as I have."

The death of Mrs. Leabo occurred on the night of the 19th of December, 1883, and the first of those letters was written less than five, the second less than four, and the last about three months before her death. The evidence tending to prove her periodical derangement in connection with that relating to defendant's uniform kindness to her, had a tendency to prove that her expressions and conduct inculpatory of her husband, were attributable to mental derangement, and the letters, if received, would have had the same tendency. They were admissible to disprove the existence of the motive to commit the murder, which the testimony for the state conduced to establish. In the *State v. Watkins*, 9 Conn. 47, Hosmer, C. J., said: "It was a prominent fact in the case, that the deceased was the *wife* of the prisoner. The presumption thence arising, that she was not killed by her husband, or that it was not of malice aforethought, was powerful." And in the *State v. Green*, 35 Conn. 205, Park, J., commenting upon *Watkins'* case, said: "These remarks of the Chief Justice accord with the common experience of mankind, that in a great majority of cases a husband will cleave unto his wife, and will protect and defend her from all injuries so far as it is in his power to do so." Again, "If this is true, then it follows that if, in a given case, the relation of husband and wife exists, and the inquiry is how the man treated

his wife, the presumption would be that he treated her in accordance with the general rule, and it would require evidence of a contrary character to rebut the presumption, and render it as probable that he treated her ill as that he treated her kindly." Again, he said : "This presumption is in addition to, and to be distinguished from, the legal presumption of innocence that exists in every case in favor of a party charged with the commission of crime; and in cases where both presumptions exist, the public prosecutor must overcome the force of both, and establish the contrary fact, before the accused can be found guilty."

And the extent to which the state is allowed to introduce evidence of what the wife has said and done, in order to show a lack of affection on his part toward her, will be found in *The People v. McCann*, 3 Parker's Criminal Reports, 294, where the state was permitted to prove that, in November, 1855, the wife made a complaint against her husband for an assault and battery, and this on his trial for murdering her, about eight months after the complaint made. The supreme court of New York held it admissible, on the ground that "it tended to show the extent of the difficulty between them," and "might properly be considered by the jury, on the question of motive." In *The State v. Watkins, supra,* evidence offered by the prosecution was received in proof of an adulterous intercourse between defendant, charged with the murder of his wife and a Mrs. Burgess, the court observing that "it effectually repelled the presumption arising from the marital relation." In *The People v. Williams,* 3 Parker's Crim. Reports, p. 84, the government was permitted to prove that some time before the killing the wife had complained of her husband as a disorderly person, and he was adjudged to pay two dollars, weekly, for her support.

In actions for criminal conversation, the letters of the wife to her husband and to third parties are admissible as evidence to show the state of the wife's feelings.

*Willis v. Bernard*, 8 Bingham's Cases in Common Pleas, 376, is one of that numerous class of cases. In that case it appears that plaintiff and his wife were residing in Upper Canada, when plaintiff, being called by business to England, left his wife, taking his mother with him. By a cross-examination of the witness who proved the above fact, defendant's counsel sought to insinuate that the plaintiff and his wife were not on good terms with each other, and that she felt offended at being left alone in Canada. Letters of the wife to a third person, while her husband was in England, expressing her attachment to her husband and her anxiety to promote his happiness, were admitted to counteract the effect of the cross-examination above referred to, and Chief Justice Tindall said : "If a person had been present when the letter was written, and had heard her make declarations that she remained freely, voluntarily, in Canada, and without offence conceived against her husband, such declaration would have been evidence of that fact;" and further observed : "I can see no material difference between a letter addressed to the husband and a letter addressed to a third person."

It is insisted that these are exceptional cases, and not in accord with the general principles of the law of evidence. Whether, in an action for criminal conversation, the wife's affection had been previously alienated from her husband, is not an immaterial question, and evidence such as that received in *Willis v. Bernard*, is not hearsay, but original evidence. There is no reason or policy for admitting evidence in such a case contrary to the rules and principles of evidence applicable to other cases. Tindall, C. J., does not place its admissibility upon that ground. He says the letter was not evidence of facts stated in it, but of the feelings of the wife. The case of *Jacobs v. Whitcomb*, 10 Cushing 256, was one in which the defendant was sued by the father of his wife for board and necessaries furnished by the father to defendant's wife, from February 24, 1849, to

February 24, 1850. It appeared that a short time prior to February 16, 1849, defendant had sold his farm and engaged board for himself and wife in the family of his mother. Plaintiff introduced evidence tending to show that defendant's wife and his mother had been unfriendly and that his wife was not willing to the proposed change, and this was among the causes which induced her to leave her husband, who, to meet this evidence, offered the declaration of his wife, made to third persons, relative to said arrangement made before the 16th of February, 1849, and on that question Bigelow, J., for the court, said: "The evidence was introduced to rebut the testimony which had been offered by the plaintiff, to prove that the wife entertained inimical feelings toward Mrs. Crosby. For this purpose we think it was competent. The plaintiff had made it part of his case to show the existence of a certain state of mind on the part of the wife. It was, therefore, necessary to meet it. This he could well do by proving her declaration on the subject, more especially as she was not a competent witness."

In *Walton v. Green*, 1 Car. and P. 621, cited in the above case, a husband was sued by a stranger for boarding and lodging the defendant's wife, he having turned her out of doors. The defence was that she had previously committed adultery, and the defendant was permitted to give in evidence her statement to one of his clerks that she had had criminal intercourse with a person whom she named. Two letters written to her by the officers of a British regiment were also admitted as evidence for the defence. In the case at bar, letters written by the wife to the husband would have been open to the same objection made to those that were offered, and, if the latter could be excluded, upon the same principle, the former would be. We do not decide that such testimony is admissible under all circumstances; but when the plaintiff makes it a part of his case to show the existence of bad blood between the husband and wife, in order to establish a motive for guilty conduct ascribed to

him, it is admissible.    If the state may introduce evi-
dence of her declarations and conduct, inculpatory of
her husband, it is equally his right to have the benefit of
her declarations and conduct, to meet such evidence ; and
what better evidence could there be of a husband's affec-
tion for his wife than her confidential letters to a friend
and companion of her youth, in which she declares that
he is the "kindest husband in the world," "worth his
weight in gold," and expressing a wish that if that
friend should ever marry she may "get such a man as
she has."    The evidence offered by Leabo was no more
hearsay than that received in the case above cited.    Will
such evidence be admitted in a civil action, in resistance
of a money demand, and refused in a criminal prosecu-
tion, in which one's life or liberty is at peril?    Has the
law less regard for the life or liberty of a citizen than for
his goods and chattels?

In the case of *Aveson v. Lord Kinnaird*, 6 East 188,
which was an action on a policy of insurance effected by
the husband on the life of his wife, the surgeon who exam-
ined the woman on behalf of the insurer testified for plain-
tiff, that " she had then good health," and that he formed
his opinion principally from her answers to his inquiries.
The defence then called a witness who testified that he
saw the deceased a day or two after the surgeon had ex-
amined her, and she then complained of being unwell,
and said she was unwell when she went to see the sur-
geon.    It was assumed by all the judges that what was
said by the deceased to the surgeon was evidence of the
state of health at that time, and they all thought that
this evidence, having been produced by the plaintiff, it
was open to defendant to rebut it by showing that she
had made different statements on another occasion upon
the same subject.    I have on this occasion thus exten-
sively discussed the question involved, because it is one
of first impression in this state, and of considerable prac-
tical importance in the administration of the criminal
law.    I think that the court erred in excluding the depo-
sition.

Defendant complains of instruction numbered one, given for the state. It declared "that if defendant killed Luella Leabo, by choking and strangling her, by fixing, fastening, etc., his hand about her neck and throat, etc., and by then throwing her, so choked and strangled, into the well, in which there was a large quantity of water, with which she was then and there suffocated and drowned, the jury should find the defendant guilty." The contention is that the instruction contained a contradiction in that the jury was required to find that the defendant killed the deceased by "choking and strangling" her, and "suffocating and drowning her in the well." We do not think it bears such a construction. One may be choked and strangled and death not result immediately; but might be choked and strangled to a point of insensibility, and in that condition thrown into a well, and the instruction was evidently based upon that theory.

We reverse the judgment and remand the cause solely because the court excluded the deposition of Ella Finley.

All the judges concur. Norton, J., in the result.