The State v. Moxley.

---

## THE STATE v. MOXLEY, *Appellant.*

1. **Criminal Law :** PROSECUTING ATTORNEY PRO TEM., POWER OF COURT TO APPOINT. The court has authority under the statutes to appoint a prosecuting attorney *pro tem.*, who will have the same power as the proper officer, including authority to sign indictments, where the prosecuting attorney and his assistant are disqualified. ( R. S. 1889, secs. 642, 643, 644.)

2. ———: ———. The court has inherent power, independent of the statute, to appoint a temporary representative of the state, who will have full authority to discharge all the duties of the office he temporarily fills.

3. ———: EVIDENCE : RES GESTÆ. On the trial of one accused of the murder of his wife, where the state of her health was in question, statements made by her as to her physical condition are admissible as part of the *res gestæ*, although not made to a medical attendant.

4. ———: ———. Where the state offered testimony on a trial for murder that the neck of the deceased was not rigid after death, as the necks of the dead usually are, in support of the theory that it had been broken, it was competent for the defense to show by one who had assisted in preparing many corpses for burial that the neck of the deceased did not differ in this respect from those of other deceased persons.

The State v. Moxley.

5. ——: ——. It is competent for the defense to ask medical experts who heard the undisputed testimony of the state concerning an autopsy, whether, in their opinion, it had been properly made.

6. ——: ——. Such evidence would not be of much pertinence or force where the evidence of guilt was positive and direct, yet it is especially applicable to a case where the evidence was wholly circumstantial.

7. ——: ——. The bones of a deceased person alleged to have been murdered, after they have been identified, may be shown to the jury, in order to illustrate to them the character and effect of the wound supposed to have caused death.

8. ——: ——. Where the expert who made the autopsy stated that he had left the bones of the deceased with one person and received them from another, and it would require other evidence to identify them, the identification is not sufficient to allow them to be exhibited to the jury.

9. ——: MURDER: CIRCUMSTANTIAL EVIDENCE: INSTRUCTION. Where the evidence on a trial for murder is wholly circumstantial, the jury should be instructed that they should not convict the accused, unless the state has proved his guilt from the evidence beyond a reasonable doubt, by facts and circumstances, all of which are consistent with each other and with his guilt, and absolutely inconsistent with any reasonable theory of innocence.

10. ——: ——: CONVERSATIONS OF DEFENDANT. On a trial for murder, where the evidence against the defendant is circumstantial, the jury should be told that casual statements made by the defendant, in the course of ordinary conversation, concerning the death of the deceased, should be considered with great caution.

11. ——: ——: INSTRUCTION. On the trial of a husband for the murder of his wife, where she came to her death suddenly, the jury should be instructed that such fact is not sufficient to warrant them in finding that her death was the result of a criminal act on the part of her husband, and unless this is shown by the evidence beyond a reasonable doubt, they must presume she died from some other cause.

12. ——: ——: ——. In such case the defendant is entitled to an instruction that he enters upon the trial not only with the ordinary presumption of innocence in his favor, but with the added and equally favorable presumption arising from the marital relation that existed between him and the deceased, and the prosecution must overcome the force of both of these presumptions before he can be found guilty.

13. ———: REMARKS OF PROSECUTING COUNSEL. The provisions of Revised Statutes, 1889, section 4219, to the effect that where a defendant does not avail himself of the right to testify, it shall not be referred to by any attorney in the case, cannot be adroitly and indirectly evaded by prosecuting counsel on the trial of one accused of murdering his wife, by argument to the jury that it was the duty of the defendant to explain to his neighbors how she came to her death.

14. ———: ———. Self-serving statements cannot be introduced in evidence by the accused, and such language by the prosecuting officer does not state the law, and where timely objection to it is overruled and it thereby goes to the jury with the sanction of the court, it will constitute reversible error.

*Appeal from Chariton Circuit Court.*—HON. G. D. BURGESS, Judge.

REVERSED AND REMANDED.

THE court gave the following instructions at the request of the prosecution:

"1. The jury are instructed that if they believe from the evidence, beyond a reasonable doubt, that the defendant, Marion Moxley, on or about October 12, 1885, in Chariton county, Missouri, wilfully, feloniously, premeditatedly and of his malice aforethought, killed Mary Moxley, in the manner and by the means specified in the indictment, then they must find him guilty of murder in the second degree, and will assess his punishment at imprisonment in the penitentiary for a term of not less than ten years.

"2. Wilfully, as used in these instructions, means intentionally, not accidentally; malice aforethought, as used in these instructions, means wickedness of purpose previously formed, though it may not be formed but for a moment; premeditatedly means thought of beforehand, for any length of time, however short; by the term feloniously is meant wickedly and unlawfully, from a depraved heart or a mind which regards not social obligation, but is fatally bent on mischief.

"3.  The doubt that will authorize an acquittal of the defendant must be a real, substantial doubt arising from the insufficiency of the evidence, and not a mere possibility that the defendant is innocent."

On behalf of the defendant the court gave the following instructions :

"1.  The court instructs the jury that the law presumes the defendant innocent in this case, and not guilty as charged in the indictment, and that you should act on this presumption and acquit the defendant, unless the state by evidence satisfies you of his guilt beyond a reasonable doubt."

"3.  The jury are instructed that the indictment in this case is of itself a mere formal accusation or charge against the defendant, and it is not of itself any evidence of defendant's guilt ; and no juror should permit himself to be to any extent influenced against the defendant because or on account of the indictment in the case.

"4.  Unless the facts and circumstances as shown by the evidence point so clearly and conclusively to the defendant's guilt, that the death of Mary Moxley cannot be reasonably accounted for upon any other theory than that of his guilt, you must find defendant not guilty.

"5.  The court instructs the jury that it devolves upon the state to show, by the evidence, to the satisfaction of the jury, beyond a reasonable doubt, every material fact necessary to constitute the crime with which the defendant stands charged ; and if the jury have a reasonable doubt, arising from the insufficiency of the evidence, of the existence of any such material fact, the jury will acquit."

"8.  The previous good character of the defendant, if proved to your satisfaction, is a fact in the case which you ought to consider, together with all the other facts in evidence in passing upon the question of his guilt or innocence of this charge ; for the law presumes

that a man whose character is good is less likely to commit a crime than one whose character is not good.

"9. The jury are instructed that, in arriving at a conclusion of the guilt or innocence of the defendant, you may consider all the facts and circumstances detailed in evidence in the trial of the cause, and if from all the facts and circumstances detailed in evidence you have a reasonable doubt of defendant's guilt, you should give him the benefit of such doubt and acquit him."

Instructions asked by defendant, and refused, are set out in the opinion of the court.

*W. W. Rucker, S. C. Major* and *Crawley & Son* for appellant.

(1) The order appointing J. C. Wallace to prosecute because of the employment of the official prosecutor in the defense did not authorize him to sign bills of indictment. *State v. Griffin*, 87 Mo. 608; R. S. 1879, sec. 518; R. S. 1889, sec. 642; *State v. Bruce*, 77 Mo. 193; R. S. 1889, sec. 4093. (2) The section of vertebræ was not sufficiently identified, and it was error to allow them to be exhibited to the jury. (3) The court erred in excluding testimony of Dr. Glenn and Dr Banning on part of defendant, as to the correct mode of conducting an autopsy, and as to whether or not the autopsy in question had been properly conducted. *Davis v. State*, 38 Md. 15, 36; Rogers' Expert Testimony, p. 239, sec. 173. (4) The trial court erred in excluding the testimony of John Gaston. (5) The trial court erred in refusing defendant's third instruction as to the degree of certainty required to convict upon circumstantial evidence. *People v. Strong*, 30 Cal. 151; 2 Best on Ev. [Morgan's Ed.] sec. 451, p. 765; *People v. Cunningham*, 6 Park. Crim. Rep. 398; *State v. Harrison*, 6 Tex. App. 42; *State v. Hunt*, 7 Tex. App. 212. (6) The court erred in refusing defendant's sixth instruction. (7) It was error to refuse

defendant's seventh instruction. *State v. Glahn*, 97 Mo. 679. ( 8 ) The trial court erred in failing to "instruct the jury in writing upon all questions of law in the case necessary for their information in giving in their verdict." This duty is made imperative by statute, whether proper instructions are asked by counsel or not. R. S. 1889, sec. 4208. And independent of the statute the same obligation exists. The defendant's timely exception on this ground is sufficient alone to warrant a reversal. *State v. Palmer*, 88 Mo. 568 ; *State v. Banks*, 73 Mo. 592 ; *State v. Branstetter*, 65 Mo. 149 ; *State v. Mahly*, 68 Mo. 315. ( 9 ) The trial court erred in suffering counsel for the prosecution to transcend the bounds of legitimate argument to the jury by calling attention to defendant's failure to testify in his own behalf. *State v. Tennison*, 22 Pac. Rep. 429 ; *State v. Mahly*, 68 Mo. 315 ; *State v. Martin*, 74 Mo. 547.

*John M. Wood*, Attorney General, for the State.

( 1 ) The testimony sought to be elicited from Mrs. Horton as to what deceased said in the summer as to the frequency of smothering spells with which she was afflicted was hearsay and immaterial. ( 2 ) The bones taken out of the neck of deceased were positively identified, and the court committed no error in allowing the expert to show from them where the injuries were located, and in admitting them in evidence. *State v. Weiners*, 66 Mo. 13. ( 3 ) The defense called Dr. Glenn and asked him if he heard the testimony of Dr. Brooks, to which he replied that he did not. Then defendant's counsel were proceeding to state what he had testified to, and the state objected, the court sustaining the objection. The rule in the examination of experts who have not had the opportunity of a personal examination, and who have not heard the testimony, is to state the whole case hypothetically and then ask him his opinion thereon. Whar. Crim. Ev. [ 9 Ed.] sec. 418,

and note; Greenl. Ev., sec. 440; *State v. Klinger*, 46 Mo. 224. (4) Several doctors called as witnesses by defendant, who testified that they had heard the expert testimony on the part of the state, were asked by the defense whether the autopsy, as testified to, was proper, what was necessary to make a proper autopsy, and what was a proper autopsy. The objection of the state to these questions was sustained. Greenl. Ev., secs. 440, 441; Whart. Crim. Ev. [9 Ed.] secs. 409, 413. (5) Instructions, numbered 3 and 6, asked by defendant, which were refused, were embraced in other instructions which were given. *State v. Smith*, 80 Mo. 516; *State v. Walton*, 74 Mo. 270. (6) The seventh instruction asked by defendant was properly refused. *State v. Bell*, 70 Mo. 633. (7) John C. Wallace who was appointed by the court to prosecute the case had authority to sign the bill of indictment. R. S. 1889, sec. 642; *State v. Bass*, 12 La. Ann. 862; *State v. Bondreaux*, 14 La. Ann. 88; *White v. Polk County*, 17 Iowa, 413; *State v. Dukes*, 11 Ind. 557; *State v. Johnson*, 12 Tex. 231; *State v. Lackey*, 35 Tex. 357; *State v. Fitzporter*, 17 Mo. App. 17; 1 Bish. Crim. Proc., sec. 280.

SHERWOOD, J.—The defendant was indicted for the murder of his wife, which was charged to have occurred on the twelfth day of October, 1885. The trial took place during the latter part of October and the first of November, 1889, resulting in a conviction of murder in the second degree and the punishment assessed at imprisonment in the penitentiary for the term of twenty years, and, judgment being entered accordingly, the defendant appeals to this court and for reversal of the judgment assigns various grounds.

The evidence, as will be seen by a statement of it which accompanies this opinion, was altogether circumstantial. The gist of the charge in the indictment was that the death was caused by an act of violence on the part of the defendant, which broke the cervical vertebræ.

At the time of the wife's death which occurred at night, at the dwelling-house of the defendant, no one was present except himself, his wife, babe and a small child, three or four years old. Another child, "Frankie," somewhat older, was at the time in the Indian Territory with its grandparents. The defendant did not go upon the stand as a witness, but it seems from the testimony of others that, so soon as his wife died, he hastened to inform his neighbors, and when they came he wished to send for a doctor, and being told it would do no good, that his wife was dead, he said he wanted to see what was the matter with her.

The defendant established an excellent character in the neighborhood in which he lived, and it appeared, also, that he was a kind husband and father. No quarrel or disturbance had ever been known to occur between the defendant and the deceased. They lived, as one witness, Welch, stated, who was intimately acquainted with them a year prior to the death of the deceased, peaceably and happily together, and that he never knew a cross word between them. This witness was frequently at the defendant's house during the year next preceding the death of the deceased, say once or twice a week, and passed by the house about every other day. Only a few days before the death of the deceased he saw her out milking, and she then had her head tied up. This witness also testified to the unmistakable and violent grief shown by the defendant while his wife lay dead in the house, and there was other testimony to the defendant's distress over his wife's death.

The father-in-law of the defendant, as well as the aunt of the deceased, and others, testified to the affectionate relations which existed between the defendant and his wife.

The *post-mortem* examination of the body of the deceased did not take place until some two months after her death, and then it seems, from the testimony of

several physicians of apparent skill and intelligence, the autopsy was not performed in a proper manner, nor in a way calculated to elicit the truth as to the cause of her death. The defendant was arrested in the Indian Territory, whither he had removed with his father-in-law, mother-in-law and little children, after first settling up his affairs, which occupied some ten days before starting in a wagon to his place of destination.

After his removal to his new home rumor began and spread in the neighborhood as to the cause of Mrs. Moxley's death, and finally took shape and crystallized itself in an official investigation conducted by Dr. Philpott, the county coroner, who, assisted by Dr. McEuen, made an autopsy of the body of the deceased. The result of this *post mortem* was that those who performed it testified that the vertebræ of the neck were dislocated between the first and second processes and fractured between the third and fourth vertebræ, the ends of the processes being broken off, both being done at the same time.

It seems to have been the theory of the state that this fracture and dislocation had been caused by the defendant suddenly and violently twisting or turning the neck of the deceased around with his hands. Several physicians, it would seem of professional prominence, testified, however, that from the testimony it was impossible for them to tell *what* was the cause of the death of the deceased, and it was shown in evidence, that during the same summer of the death of the deceased her health was very poor, she was sick, complaining of neuralgia of the teeth and head, and she always claimed to have heart disease, and, during the same summer, "she had the fever and chills, flux and several other diseases together, and the toothache." She also had smothering spells, and was sick in bed about two weeks before her death occurred, when she told Mrs. Horton that she did not think she was going to live long, that during the smothering spells her heart

would seem to come up in her throat, and that it seemed like she would smother to death.

This witness was asked if the deceased told her "how often those spells would come;" but, on objection of the state, this question was not permitted to receive an answer.

At the close of the testimony certains instructions were given on behalf of the state and also on behalf of the defendant, and certain instructions asked on behalf of the latter were refused. These instructions given and refused will accompany this opinion, and need not be here set out, only such as are discussed.

I.  Before proceeding to the discussion of the merits of this cause disposition must first be made of a preliminary point.  It is claimed on behalf of the defendant that the indictment is invalid and insufficient in law, because signed by an unauthorized person, to-wit, by the prosecuting attorney *pro tem.*, the regular officer being present in court, though disqualified by having been employed for the defense, prior to his election.

Counsel for the defendant insist that, as the regular official was neither *sick* nor *absent*, that the circuit court thought it had authority to appoint J. C. Wallace to represent the state, yet this order of appointment did not clothe him with any power *to sign bills of indictment*.  Section 643, Revised Statutes, 1889, prescribes the method to be pursued where the proper prosecuting officer is sick or absent, but section 642 is much broader in its scope.  That section provides : " If the prosecuting attorney and assistant prosecuting attorney be interested or shall have been employed as counsel in any case where such employment is inconsistent with the duties of his office,  *  *  *  the court having criminal jurisdiction may appoint some other attorney to prosecute or defend the cause." R. S. 1889, sec. 642.

Section 644, however, provides that : " The person thus appointed shall possess the same power and receive

The State v. Moxley.

the same fees as the proper officer would if he were present."

This section evidently refers to *both* the preceding sections. Under it the attorney appointed by the court to prosecute in the place of an absent, sick or disqualified officer has the same power to draw and to sign bills of indictment as the regular official. If this be not true then it must be confessed that there is a very lame place in our criminal practice.

If the contention of defendant's counsel is to prevail, then, if a prosecuting attorney should be for any reason disqualified, all the wheels of criminal justice would be brought to a standstill for the reason that there would be no *vacancy* in the office that the governor could fill, and no power in the court to make a temporary appointee who could in *all* things discharge the duties pertaining to the office in question. The law does not intend any such absurdity, and will not permit such a failure of justice. And aside from statutory provisions, such as those quoted, the power thus to appoint a temporary representative of the state, one armed with full authority to discharge in full the office he temporarily fills, is of necessity *an inherent power* in courts of justice. The authorities abundantly sustain this view. *White v. Polk County*, 17 Iowa, 414; *State v. Bass*, 12 La. Ann. 862; *Dukes v. State*, 11 Ind. 557; *State v. Johnson*, 12 Tex. 231; 1 Bishop Crim. Proc., sec. 280.

II. Error was committed by the trial court in refusing permission to the witness, Mrs. Horton, to answer the question as to what the deceased said as to how often the smothering spells came on. This conversation was not *hearsay;* it was original evidence, a part of the *res gestæ*. In such cases *conversations* had between the person whose health is in question, and the witness, are admissible even though made to a person other than a medical attendant, though if made to the

latter they would, of course, possess greater weight as evidence, yet they are not to be rejected because made to a non-professional person. *Reg. v. Johnson*, 2 Car. & K. 354; 1 Greenl. Ev. [14 Ed.] sec. 102, and cas. cit.

It cannot be said how much weight such testimony as that mentioned would have had if elicited; but it might have had quite a material bearing in determining the bodily condition of the deceased on the night of her death; at any rate, the defendant had the right to have it go to the jury for what it was worth. And this is especially true when it is remembered that the value of such testimony when elicited could have been passed upon by medical experts, and the proper professional deductions drawn by them therefrom.

III. The testimony of some of the witnesses was to the effect that the neck of the deceased was not possessed of the *rigidity* which usually characterizes the neck of a dead person, and the theory of the state was that this *limberness* of the neck was owing to its having been broken.

Gaston was shown to have assisted in preparing many corpses for burial, and it was proposed to show by him that the neck of the deceased was not different in this regard from the necks of other deceased persons; but this information was not permitted to be elicited, apparently on the theory that the witness was not a *doctor*. In our opinion this was competent testimony. The witness was shown to be an expert in such matters, and the fact that he was not a physician cuts no figure in the case.

The testimony thus rejected by the court, if the answer to the question put had been answered to the effect that the neck of the deceased did not differ in point of limberness from the necks of other corpses, would have had a tendency to combat the testimony of the state's witnesses on that point, and it should for this reason have been admitted.

VOL. 102—25

IV.  It was also competent to show by the medical experts who heard the testimony concerning the autopsy, and for them to give their opinion whether it had been "properly made,"—that is, with the requisite care and skill, or in the usual way such things should be done.  If such experts were not the proper persons by whom to establish that the *post mortem* was insufficiently and improperly made, it is difficult to see how or in what way it could be shown that the proper method of procedure was not pursued in that particular, in the case at bar.

If experts in medicine and surgery were not competent witnesses on this point, who were?  Was the autopsy and the manner it was made to stand as *conclusive* evidence that it was *properly* made, and thus forbid all challenge and all investigation?  It would certainly be a novelty in the law if such a question were to receive an affirmative answer.  This is a matter which seems so plain as to require no further discussion.

The position here taken is supported by authority. In *Davis v. State*, 38 Md. 15, it is said :  "If the purpose was to show that the examination of the wounds and fracture was not made in a proper and skilful manner, this could only be done through the testimony of witnesses competent to testify on the subject."  To the same effect is Rogers' Expert Testimony, section 173. This position is also in accord with the general principles which govern the admission of expert testimony. Of course there are cases where the facts being *doubtful* the expert must be asked his opinion upon a similar case hypothetically stated.  1 Greenl. Ev. [ 14 Ed.] sec. 440.  But where, as here, the facts relating to the autopsy are undisputed, it is permissible to ask the expert to give his opinion upon those undisputed facts as proven by other witnesses on the trial.  1 Greenl. Ev., sec. 440 ; Whart. Crim. Ev. [ 8 Ed.] sec.  418 ;

*McNaughten's Case*, 10 Cl. & Fin. 200 ; *Hand v. Brookline*, 126 Mass. 324 ; *Hunt v. Gaslight Co.*, 8 Allen, 169 ; *Cook v. Castner*, 9 Cush. .266.

If an expert has heard the testimony, no reason is perceived why he may not form as correct an opinion based upon such testimony as if the testimony he has just heard were first stated hypothetically, and then his judgment asked thereon. Such a vain repetition would seem indeed to be but an idle ceremony. *Gilman v. Strafford*, 50 Vt. 723.

V. The foregoing remarks in the paragraphs 2, 3 and 4, though they would not be possessed of much pertinence, importance or force where the inculpatory evidence was positive and direct, yet they are especially applicable to a case of this character, where the evidence was wholly circumstantial, and where the mind investigating the circumstances seeks light from every source, and where the jury in endeavoring to reach a correct conclusion as to the guilt or innocence of the accused should have all the aid which may be afforded them by the slightest fact or circumstance having any bearing on the issue before them. *Cooper v. State,* 19 Tex. 449.

VI. We have ruled that it is permissible to exhibit to a jury during a criminal trial the spinal vertebræ of a deceased person said to have been murdered, in order to illustrate to them the character and effect of the wound supposed to have caused death. *State v. Wieners,* 66 Mo. 13. But of course before such exhibition can be made of the bones, they must be first *identified.* This was not done in this instance. Dr. Philpott, the coroner, though he produced spinal vertebræ in evidence, yet he twice said expressly, that "*it will require other evidence to identify it;* " and he further testified that he had left the piece he exhibited with *Wesley Ellis*, but received it not from him but from *Russell Schumacher.* This other identifying evidence was not produced, and,

though the witness thought the bones were the same that he gave to Wesley Ellis, yet he could not identify them by any marks or indications showing them to be the same bones he obtained when making the autopsy. In fact he had two sets of bones in his pocket at the time he testified. Counsel for the state promised to identify the bones by other witnesses, but this was not done. In such circumstances the bones were not sufficiently identified to authorize their admission in evidence, and consequently error was committed in thus admitting them.

In this connection it will be observed that the evidence shows that the autopsy was confined to the *neck* alone of the deceased ; neither the heart, lungs or other vital organs underwent examination. Such an autopsy would seem to be very imperfect and unsatisfactory, and such appears to have been the opinion of some of the physicians concerning it, when testifying that it was impossible for them to tell from the evidence what caused the death of the deceased.

VII. The instructions are next for consideration. It is unnecessary to comment on those given at the instance of the state, since they are those usually given. Attention will be directed to those refused the defendant.

The third instruction asked on his behalf was as follows : "3. The prosecution seeks a conviction in this case upon circumstantial evidence alone. The court, therefore, instructs you that you cannot convict the defendant unless the state has proven his guilt from the evidence beyond a reasonable doubt, by facts and circumstances, all of which are consistent with each other and with his guilt, and absolutely inconsistent with any reasonable theory of innocence."

This instruction was not embodied in any others given. It stated in apt terms the principle applicable to cases of this sort. Burrill says : "Supposing then, that, by a course of examination, combination and inference, such as has already been described, the jury have

reached the point of forming an affirmative belief of the probability, and strong probability, of the hypothesis of guilt, their task is not yet completed.   A great and final test of the accuracy of the conclusion they are thus led to form remains to be applied, in which the entire and peculiar efficacy of circumstantial evidence is said to consist; its application constituting the second stage in the general process of presumption employed in the case.   This test is the negative point of view, just mentioned.   It is not sufficient that the circumstances proved coincide with, account for and therefore render probable the hypothesis sought to be established; but they must ·exclude, to a moral certainty, every other hypothesis but that single one."   Circum. Ev., p. 181.

In another work of merit, the same line of thought is pursued, thus:   "The hypothesis of delinquency should be consistent with all the facts proved. The chief danger to be avoided when dealing with presumptive evidence arises from a proneness natural to man, to jump to conclusions from certain facts, without duly adverting to others which are inconsistent with the hypothesis which those facts seem to indicate.   *   *   * It should never be forgotten, as observed by an able writer on the law of evidence, that all f cts and circumstances which have really happened were perfectly consistent with each other, for they did actually so consist; an inevitable consequence of which is that, if any of the circumstances established in evidence is absolutely inconsistent with the hypothesis of the guilt of the accused, that hypothesis cannot be true."   2 Best Ev. [Morgan's Notes] sec. 451.

It is scarcely necessary to say that this familiar principle of evidence is frequently enunciated in the reports of adjudged cases.   *People v. Cunningham*, 6 Park. Crim. Rep. 398; *People v. Strong*, 30 Cal. 151; *Harrison v. State*, 6 Tex. Ct. App. 42.   The refusal of this instruction must therefore be held erroneous.

VIII.   The seventh instruction asked on the part of the defendant was this :    "7.   Although the jury may believe from the evidence that defendant made statements to various persons concerning the manner or circumstances attending the death of his wife, still, if such statements were made casually, in the course of ordinary conversations, they should be considered with great caution, because of the liability of witnesses to forget or misunderstand what was really said or intended."

The record shows that the defendant immediately on the death of the wife, and very shortly thereafter, indulged in a good deal of conversation relative to the death of his wife and its supposed cause ; much reliance was placed on these conversations by the state, and upon this basis it was that the instruction just quoted was asked.

On this point, Greenleaf says :    " With respect to all *verbal admissions*, it may be observed that they ought to be received *with great caution*.   The evidence, consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistake ; the party himself either being misinformed, or not having clearly expressed his own meaning, or the witness having misunderstood him.   It frequently happens, also, that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say."    1 Greenl. Ev. [ 14 Ed.] sec. 200.

These casual conversations in which the defendant is supposed to have made divers damaging admissions had occurred some *four* years before they were disclosed in evidence, and a cautionary instruction such as that asked here was entirely appropriate and should have been given ; its refusal was error.   In *State v. Glahn*, 97 Mo. 679, it was ruled that in similar circumstances such an instruction should have been given.

IX.   The sixth instruction for the defense, which the court refused to give, was this :    "6.   The mere fact

The State v. Moxley.

that the deceased came suddenly to her death is not sufficient to warrant you in finding that death was the result of a criminal act. The prosecution has undertaken to prove that the death of Mary Moxley was caused by injuries inflicted upon her with force and violence by her husband; and unless such proof has been made to your satisfaction, beyond a reasonable doubt, then you are bound to presume that Mrs. Moxley died from some other cause, no matter whether the evidence shows what that cause was, or not."

The mere fact of the sudden death of the deceased, present the defendant, constituted no evidence whatever that such death was caused by his guilty agency. And, if no more evidence than the simple fact of the wife's death had been introduced, it would have been the duty of the court to have directed the acquittal of the defendant; and unless, in the opinion of the jury there was evidence other than that mentioned, evidence which established that the death of the wife was the result of a criminal act, and that the defendant was the doer of that act, then certainly their verdict should have been in his favor.

The instruction asked was, therefore, *a guide* to the triers of the facts, and would have enabled them to see that *something* else was necessary to support a verdict of guilty, other than the sudden and unexplained death of the deceased. Such an instruction *was but a statement of the law of evidence governing this case*, and was no more a *comment* on that evidence than was the instruction quoted in the next preceding paragraph of this opinion. Such an instruction in effect as the one under discussion was asked in the case above cited, and its refusal was held error. It is true that the instruction there refused was in relation to mere *threats*, and the one here is in relation to the mere fact of *sudden death;* but the principle in either case is the same. The refusal of the defendant's sixth instruction was consequently erroneous.

X.   It is claimed that there is no evidence to support the verdict.   Having carefully read the evidence we are not prepared to say that there is such a lack of testimony as would authorize the defendant's discharge; but we are prepared to say that it is a case resting, as it does, on circumstantial evidence alone, that demands at the hands of the jury the most careful consideration of the facts in evidence; and such investigation should be made only after they have been fully instructed by the court "upon all questions of law arising in the case which are necessary for their information in giving their verdict."   R. S. 1889, sec. 4208. This section, which was amended at the last revision, provides, also, that "a failure to so instruct in cases of felony shall be good cause, when the defendant is found guilty, for setting aside the verdict of the jury and granting a new trial."

* In connection with these observations in relation to the sufficiency of the evidence, it is proper to say that, in a trial of this character, the defendant enters upon it not only with the *ordinary presumption* of innocence in his favor, but with the added and equally favorable presumption that arises in consequence of the *marital relations* existing between the parties, and, in cases of this sort, the prosecutor must overcome the force of *both* these presumptions by competent evidence, before the accused can be found guilty.   Upon a careful review of the authorities, this legal principle was fully approved in *State v. Leabo*, 84 Mo. 168.   It is proper that this *additional* and *independent* presumption should be brought to the attention of the jury in an appropriate instruction, in reference to which the same considerations apply as in the two preceding paragraphs of this opinion.

XI.   In his opening argument to the jury *L. H. Waters*, one of the assistant prosecuting attorneys, used the following language:

The State v. Moxley.

"They have offered not a word to explain or show how that woman came to her death. Not a neighbor was put upon that stand—if I am right—man, woman or child, kinsman or stranger, to show what *he* said had caused her death. Gentlemen, instead of hunting up an explanation made by *him* to his neighbors—or if they ever made an effort they never produced the result of that effort in this court. There they are alone; she in perfect health; and in the night time she comes to her death suddenly. *We say that common honesty, common decency, require at the hands of that man, when he sees his neighbors, to tell how she came to her death!* I don't care whether innocent or guilty; if guilty, he goes to work to make up a story; if innocent, he tells the truth. The neighbors expected it of him; your neighbors would expect it of you; and, gentlemen—you would expect it of *yourselves!*" To which defendant then and there excepted at the time.

Section 4219, Revised Statutes, 1889, provides that: "If the accused shall not avail himself or herself of his or her right to testify, or of the testimony of the wife or husband, on the trial of the case, it shall not be construed to affect the innocence of guilt of the accused, nor shall the same raise any presumption of guilt, nor be referred to by any attorney in the case, nor be considered by the court or jury before whom the trial takes place."

The words "*referred to*" evidently mean "*alluded to.*" "*Refer*" is a synonym of "*allude,*" and these words are used interchangeably. If the object of the statute was to prevent the jury from considering the fact that a defendant has failed to testify, it is easy to see that as much could be accomplished to defeat that object by an *allusion* to such fact, as by *reference* thereto.

The language of which complaint is made was simply an *adroit* and insinuating attempt, indirectly to accomplish what could not have been accomplished by a

direct statement.    The statute does not permit such eva-sions of its manifest purpose.

XII.    Besides, the language used *was not the law.* Nothing is better established in the law of evidence than that what are termed self-serving statements can-not be received nor introduced in evidence by the accused.

This language was objected to at the time, but the objection was overruled, so that it went to the jury with the sanction of the court.    The failure of the trial court promptly to rebuke such improper utterances of prosecuting counsel is also reversible error.

Because of the erroneous rulings aforesaid, the judgment is reversed and the cause remanded, and if the accused is confined in the penitentiary he will be returned for a new trial.

Ray, C. J., and Black, J., concur in all that has been said.  Brace, J., does the like except as to the last clause of paragraph 10, marked by an *.  Barclay, J., will hereafter give expression to his own views.

### SEPARATE OPINION,

Barclay, J.—In my opinion the judgment should be reversed, and a new trial granted on the grounds stated in paragraphs, numbered 3, 6, 7, 11 and 12, in the foregoing opinion of the majority of the court, delivered by my learned associate.